IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| PMGI Holdings Inc., *et al.*,[1] | ) | Case No. 13-12404 (CSS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| _____ | ) | |
| | ) | |
| Guccione Collection, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Adv. Proc. No. 13- |
| | ) | |
| FriendFinder Networks Inc., and | ) | |
| General Media Communications, Inc. | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## COMPLAINT FOR DECLARATORY AND OTHER RELIEF

Plaintiff Guccione Collection, LLC ("GC"), by and through its undersigned counsel, hereby alleges as follows in support of its Complaint:

## NATURE OF THE ACTION

1. This is an action for a declaratory judgment and damages involving plaintiff's rights to valuable art and intellectual property and defendants' wrongful conduct in relation thereto. Plaintiff GC has purchased numerous assets formerly belonging to Bob Guccione, the

---

[1] The Debtors in these Chapter 11 Cases, along with the last four (4) digits of each Debtor's federal tax identification number, are: Blue Hen Group Inc. (9667), Argus Payments Inc. (4661), Big Island Technology Group, Inc. (9795), Confirm ID, Inc. (7020), Danni Ashe, Inc. (5271), Fastcupid, Inc. (7869), Fierce Wombat Games Inc. (2019), FriendFinder California Inc. (2750), FriendFinder Networks Inc. (0988), FRIENDFINDER VENTURES INC. (3125), FRNK Technology Group (7102), General Media Art Holding, Inc. (2637), General Media Communications, Inc. (2237), General Media Entertainment, Inc. (2960), Global Alphabet, Inc. (7649), GMCI Internet Operations, Inc. (7655), GMI On-Line Ventures, Ltd. (7656), Interactive Network, Inc. (5941), Magnolia Blossom Inc. (8925), Medley.com Incorporated (3594), NAFT NEWS CORPORATION (4385), Penthouse Digital Media Productions Inc. (1056), Penthouse Images Acquisitions, Ltd. (9228), PerfectMatch Inc. (9020), Playtime Gaming Inc. (4371), PMGI Holdings Inc. (2663), PPM Technology Group, Inc. (9876), Pure Entertainment Telecommunications, Inc. (9626), Sharkfish, Inc. (1221), Snapshot Productions, LLC (7091), Streamray Inc. (2716), Streamray Studios Inc. (1009), Tan Door Media Inc. (1100),Traffic Cat, Inc. (1223), Transbloom, Inc. (1168), Various, Inc. (7762), Video Bliss, Inc. (6760), West Coast Facilities Inc. (4751), XVHUB Group Inc. (9401). The Debtors' business address is 6800 Broken Sound Parkway NW, Suite 200, Boca Raton, FL 33487.

now-deceased former owner and publisher of Penthouse Magazine ("Penthouse"). The assets purchased by GC include photographs taken, art created, and films written and directed by Mr. Guccione. GC maintains a website dedicated to the life and art of Mr. Guccione, where, among other things, it offers these assets for sale and publishes articles about the life and work of Mr. Guccione. Defendant FriendFinder Networks Inc. ("FriendFinder"), through its subsidiary defendant General Media Communications, Inc. ("General Media"), claims to have purchased certain assets and property rights relating to Penthouse.

2.     Defendants FriendFinder and General Media have asserted that the operation of GC's website infringes various intellectual property rights that defendants claim to own. In furtherance of this claim, defendants served a "takedown notice" pursuant to section 512 of the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 512, which resulted in the temporary closing down of plaintiff's website and damaging interruption of GC's business. In addition, FriendFinder has sent a "cease and desist" letter to plaintiff demanding that plaintiff cease its allegedly infringing activities.

3.     The truth, however, is that the assets offered for sale by GC belonged personally to Mr. Guccione and were never owned by Penthouse. Thus, even if FriendFinder and General Media purchased the assets of Penthouse and those assets included the intellectual property of Penthouse, defendants cannot demonstrate that they own any intellectual property rights covering the assets owned by GC. Further, even if they could demonstrate that they owned those rights (which they cannot), GC's use of those rights would fall squarely within the doctrine of "fair use."

4.     Through this action, GC seeks (i) a declaration holding that it has not infringed any valid intellectual property owned by defendant; (ii) damages, including costs and attorneys'

2

fees, pursuant to 17 U.S.C. § 512(f), in that defendants made knowing and material misrepresentations in their "takedown notice" that GC was infringing; and (iii) damages as a result of defendants' tortious interference with GC's current and prospective economic relations.

<strong><u>PARTIES</u></strong>

5.      GC is a limited liability company organized under the laws of the State of Delaware, with its principal place of business located in New Jersey.  The members of GC are Jerrick Ventures LLC ("Jerrick") and JAJ Investment Holdings LLC ("JAJ").  The members of Jerrick are Jeremy Frommer and Rick Schwartz, both of whom are citizens of the State of New Jersey.  The members of JAJ are Jerrick, as well as Arline Schwechter, Jason Luogameno, and Jeremy Frommer, each of whom is a citizen of the State of New Jersey.

6.      Upon information and belief, Defendant FriendFinder is a corporation organized and existing under the laws of Nevada with its principal place of business located at 6800 Broken Sound Parkway NW, Suite 200, Boca Raton, FL 33487.

7.      Defendant General Media is a corporation organized and existing under the laws of the State of Delaware with its principal place of business located at 6800 Broken Sound Parkway NW, Suite 200, Boca Raton, FL 33487.

<strong><u>JURISDICTION AND VENUE</u></strong>

8.      The Bankruptcy Court has jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334(b) because this adversary proceeding is related to the above-captioned bankruptcy cases pending in this Court.

9.      Alternatively, the United States District Court for the District of Delaware (the "District Court") has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338, in that it arises under the Copyright Act of the United States.  In addition, the District

3

Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, in that the matter in controversy exceeds the sum or value of $75,000 and it is between citizens of different states. The District Court has supplemental subject matter jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a), in that the state law claims arise from the same transaction or occurrence as the federal law claims and are so related to those claims that they form part of the same case or controversy.

10.     This is a non-core proceeding and Plaintiff does not consent to the entry of final orders or judgments by the Court if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

11.     Venue is proper in this Court pursuant to 28 U.S.C. §1409.

## BACKGROUND

12.     Bob Guccione founded Penthouse Magazine in the mid-1960s.  He was a talented artist and photographer, and during the course of his career, he took many photographs that were never used in Penthouse and that never belonged to Penthouse.  He also created numerous paintings and other artwork, wrote articles, and kept back copies of Penthouse and other magazines.  All of this was his personal property, and never belonged to Penthouse.

13.     In 2003, after a series of bad investments and years of declining subscriptions, General Media, Penthouse's parent, went bankrupt.  Ultimately, General Media emerged from bankruptcy as a wholly-owned subsidiary of FriendFinder.  As a result of Penthouse's bankruptcy, as well as litigations with Penthouse's new owner, Mr. Guccione's own finances also suffered.  Many of his personal articles were assigned to his creditors, and others remained locked in a storage facility in Englewood, New Jersey.

4

14.    In or about February 2012, Jeremy Frommer – one of the principals in the parent company of GC – purchased at auction the contents of that storage facility in Englewood, New Jersey.  The storage facility contained numerous valuable and interesting items that had previously belonged to Mr. Guccione, including numerous examples of the erotic photography for which Mr. Guccione was famous, as well as films, magazines, artworks and documents of historical significance.  Subsequently, Mr. Frommer engaged in extensive research, using the information available in the storage locker as well as other resources, to locate other items that had formerly belonged to Mr. Guccione.  He was able to locate – in Phoenix, Arizona – a creditor of Mr. Guccione who had received numerous personal effects of Mr. Guccione.  In November 2012, Mr. Frommer purchased those items as well.  Thereafter, Mr. Frommer assigned all of the property that he had purchased to a newly formed entity – Guccione Collection LLC, the plaintiff here – and began offering those items for sale, as the "Guccione Collection," through a website.

15.    Shortly after acquiring the items that would form the Guccione Collection, Mr. Frommer approached the chief executive officer of Penthouse – Mark Bell – to determine whether Penthouse was interested in acquiring any of the Guccione Collection.  Mr. Bell responded by saying that Mr. Frommer "did not have anything of value" and "I don't care what you have."  Thereafter, he refused to take Mr. Frommer's phone calls.

16.    On the morning of September 17, 2013, defendant FriendFinder filed for bankruptcy.  On that same day, several reports appeared in the newspapers – including the New York Post and the Daily Mail – indicating that Mr. Frommer was interested in purchasing Penthouse as part of FriendFinder's bankruptcy.

17.     Later that same day, and after it filed its petition for bankruptcy, FriendFinder took two actions which were wrongful:  1)  FriendFinder sent a "cease and desist" letter to GC, claiming that GC's website infringed FriendFinder's intellectual property rights (the "Cease and Desist Letter"), and 2) FriendFinder sent a "takedown notice," pursuant to section 512 of the DMCA, 17 U.S.C. section 512, to the hosting service for GC's website (the "Takedown Notice").

**The Cease and Desist Letter**

18.     A true and correct copy of the Cease and Desist Letter is attached hereto as Exhibit A.

19.     The Cease and Desist Letter accuses GC of "infringing and diluting" defendants' trademarks, "infringing and misappropriating" their intellectual property, and "unlawfully exploiting" their "content."  (Exhibit A at 1).  The Cease and Desist Letter demands that GC "[i]mmediately cease and desist from using [General Media's] marks and property," "immediately cease and desist from any further unauthorized use of the Penthouse trademarks and copyrights in any form," "[g]uide [its] actions accordingly with regard to the items being sold," and "[p]rovide [defendants] a full accounting of any and all monies collected via the infringing uses noted herein." (Exhibit A at 2).

20.     The Cease and Desist Letter concludes as follows:

> Please be advised that if we have not received an acceptable confirmation of your willingness to comply with **ALL** the foregoing on or before close of business on Wednesday, September 25, 2013, we will have no other option than to take all applicable appropriate steps to protect and enforce our rights hereunder, including if necessary, commencing legal action, contacting the appropriate authorities, and/or pursing all appropriate remedies which may or may not include injunctive relief, claims for compensatory and explanatory damages,

6

> attorney's fees, an accounting of revenues associated with the use
> of the Infringing Site, and all associated costs with [General
> Media's] claims hereto.

(Exhibit A at 3) (emphasis in original).

21.     In truth, however, none of GC's activities has infringed any valid intellectual property of defendants. Each of the alleged infringing uses was either justified by GC's own possession of a copyright or trademark, did not amount to infringement, or was permitted under the doctrine of "fair use." Further, upon information and belief, defendants will be unable to prove that they are the owners of some or all of the intellectual property that they are asserting against GC. Defendants thus have no valid claim for infringement against plaintiff.

**The Takedown Notice**

22.     A true and correct copy of the Takedown Notice is attached hereto as Exhibit B.

23.     The Takedown Notice, which purports to be sent pursuant to section 512 of the DMCA, 17 U.S.C. section 512, does not specifically identify any particular copyrighted material that it claims should be removed from GC's website, as required by the statute. Instead, it demands that the entire content of GC's website be removed because the use of the content on the webpage allegedly is "not authorized by the trademark owner, its agent, or the law." Section 512, however, is part of the copyright law, and does not apply to trademarks. Further, even if section 512 did apply to trademarks, GC's use of the defendants' trademarks is and was protected by the doctrine of fair use.

24.     Upon information and belief, defendants drafted the Takedown Notice to focus on their alleged trademark rights – and failed to specifically focus on any copyright claims that they might have had – in order to intimidate the host of GC's website into taking down the entirety of GC's website. Upon information and belief, defendants knew, or should have known, that the

7

only possible work identified in the Takedown Notice that could even possibly qualify for copyright protection was the film "Caligula," but they also knew that if they limited their Takedown Notice simply to that claim, it would not severely interrupt plaintiff's business. Thus, in order to intimidate the host of GC's website into taking down the whole site, defendants focused the Takedown Notice on their alleged trademark rights, even though section 512 has nothing whatsoever to do with trademark rights. Moreover, defendants knew, or should have known, that GC's use of any trademarks allegedly belonging to defendants falls squarely within the doctrine of "fair use."

25.     As a result of defendants' deliberately misleading Takedown Notice, the host of GC's website did, in fact, take down the entirety of GC's website without any prior notice to GC. As a result, GC had its business interrupted, was forced to spend numerous hours working to have its website restored, and was forced to explain to the press why its website was down, thereby damaging its reputation.

## FIRST CLAIM FOR RELIEF
### (Declaratory Judgment Against Both Defendants)

26.     Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 25 above as if fully set forth herein.

27.     Defendants claim that plaintiff is currently infringing valid intellectual property rights belonging to them.

28.     Plaintiff is not infringing any valid intellectual property rights belonging to defendants.

29.     There is a real and substantial controversy between parties with adverse legal interests. This Court may grant a declaratory judgment in accordance with 28 U.S.C. § 2201(a).

30.     Plaintiff is entitled to a declaratory judgment holding that it is not infringing any valid intellectual property rights belonging to defendants.

## SECOND CLAIM FOR RELIEF
### (Violation of 17 U.S.C. § 512(f) Against Both Defendants)

31.     Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 29 above as if fully set forth herein.

32.     Upon information and belief, defendants knowingly and materially misrepresented in the Takedown Notice that certain of plaintiff's activities were infringing valid copyrights and trademarks, and exaggerated their claims by focusing nearly exclusively on trademark rights, even though they knew that (a) trademark rights are not covered by 17 U.S.C. section 512(f) and (b) GC's use of any trademark rights allegedly belonging to plaintiff fell squarely within the doctrine of "fair use."

33.     GC's hosting company relied on these misrepresentations and took down GC's website, causing damage to GC.

## THIRD CLAIM FOR RELIEF
### (Tortious Interference with Contract Against Both Defendants)

34.     Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 33 above as if fully set forth herein.

35.     Plaintiff had a valid contract with the company that provided hosting services for its website.

36.     Defendants knew that plaintiff had such a contract.

37.     Defendants intentionally caused the webhosting company to breach that contract without justification, by falsely claiming that plaintiff had infringed its intellectual property and exaggerating its claims against plaintiff.

38.    As a result of defendants' interference, the webhosting company breached the contract with plaintiff by unjustifiably taking down plaintiff's website.

39.    Plaintiff was damaged by defendants' tortious interference.

### FOURTH CLAIM FOR RELIEF
### (Tortious Interference with a Business Relationship Against Both Defendants)

40.    Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 39 above as if fully set forth herein.

41.    Plaintiff had a business relationship with the company that provided hosting services for its website.

42.    Defendants knew that plaintiff had such a business relationship.

43.    Defendants, upon information and belief, acting solely out of malice, or using dishonest, unfair, and improper means, intentionally interfered with plaintiff's business relationship with the webhosting company by falsely claiming that plaintiff had infringed its intellectual property and exaggerating its claims against plaintiff.

44.    As a result of defendants' interference, the webhosting company unjustifiably took down plaintiff's website.

45.    Plaintiff was damaged by defendant' tortious interference.

**WHEREFORE**, plaintiff demands judgment as follows:

(a)    on the First Claim for Relief, declaring that plaintiff has not infringed any valid intellectual property rights owned by defendants;

(b)    on the Second Claim for Relief, awarding damages to GC against defendants in an amount to be determined at trial, together with interest, plus its costs and attorneys' fees, as provided by statute;

10

(c)    on the Third and Fourth Claims for Relief, awarding damages to GC against

defendants in an amount to be determined at trial, together with interest;

(d)    awarding to GC attorneys' fees and all other costs of this action; and

(e)    awarding such other and further relief as this Court deems just and proper.

Dated:  September 25, 2013
        Wilmington, DE

CROSS & SIMON, LLC

By: _____
    Christopher P. Simon (No. 3697)
    David G. Holmes (No. 4718)
    913 North Market Street, 11th Floor
    P.O. Box 1380
    Wilmington, DE 19899-1380
    Ph: (302) 777-4200
    Fax: (302) 777-4224
    rcross@crosslaw.com
    csimon@crosslaw.com
    dholmes@crosslaw.com

    -and-

    FRIEDMAN & WITTENSTEIN
    A Professional Corporation
    Stuart I. Friedman
    Andrew A. Wittenstein
    Paul S. Grossman
    Claire L. Chau
    600 Lexington Avenue
    New York, New York 10022
    (212) 750-8700
    sfriedman@friedmanwittenstein.com
    awittenstein@friedmanwittenstein.com
    pgrossman@friedmanwittenstein.com
    cchau@friedmanwittenstein.com

    *Attorneys for Plaintiff*